UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| JANE BURROWS,              )<br>                            )<br>            Plaintiff,      )<br>                            )<br>    -vs-                    )<br>                            )<br>                            )<br>WILLIAMSBURG COUNTY, STANLEY )<br>PASLEY, WALT ACKERMAN, and  )<br>PHYLLIS UNDERWOOD,          )<br>                            )<br>            Defendants.      )<br>_____ ) | Civil Action No.: 4:13-cv-2464-RBH-TER<br><br><br><br><br><br>**REPORT AND RECOMMENDATION** |

## I.    INTRODUCTION

This is an employment case. Plaintiff alleges reverse race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000(e) et seq. She also asserts state law claims for breach of contract and civil conspiracy. Plaintiff originally filed this action in the Court of Common Pleas, Williamsburg County, South Carolina. Defendants removed the action to this court. Presently before the court is Defendants' Motion for Summary Judgment (Document # 32). All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(g), DSC. This report and recommendation is entered for review by the district judge.

## II.    FACTS

Plaintiff, a white female, worked for her family business, the True Value Hardware Store located in Kingstree, South Carolina for over thirty years. Pl. Dep. 10-12 (Ex. 1 to Pl. Response; Ex. 1 to Def. Motion). Plaintiff's father was the original owner and operator of the hardware store, and Plaintiff worked for her father for ten (10) years until she and her husband assumed ownership in 1985. Pl. Dep. 10-12. Plaintiff was the co-owner and operator of the hardware store until she applied

and gained employment with the Williamsburg County Water and Sewer Department (the Department) in 2012. Pl. Dep. 29. In addition to owning and operating the hardware store alongside his wife, Plaintiff's husband is the Mayor of Kingstree. Pl. Dep. 15.

While Plaintiff was still employed with True Value Hardware Store and prior to seeking employment with the County, Plaintiff was also a board member of the local animal shelter. Pl. Dep. 101-104. For several reasons – including insufficient funding and supervision – the board filed a lawsuit against the County, which resulted in the construction of a new shelter, costing the County millions of dollars. Pl. Dep. 102-110.

In early 2012, the Department was preparing to move to a new physical location within the County. Whiteside Dep. 48 (Ex. 4 to Pl. Response; Ex. 5 to Def. Motion). In anticipation of the move, Phyllis Underwood, the County Controller, was emphatic that the Department Director, Jack Whiteside, hire an additional clerk. Whiteside Dep. 48-49; Boatwright Dep. 59 (Ex. 5 to Pl. Response). Whiteside sought help from the County Personnel and Benefits Administrator Jacquelyn Hailes to fill the clerk position, but his attempts were unsuccessful.[1] Whiteside Dep. 48-50. Vicki Boatwright, Whiteside's administrative assistant, was aware of the need to fill the clerk position and inquired whether Plaintiff would be interested.[2] Boatwright Dep. 61-62. Plaintiff expressed her interest in the position, and on February 1, 2012, Plaintiff met with Boatwright and Whiteside to

---

[1] Whiteside testified it was his understanding that the head of each department has the authority to hire and fire employees in that department. Whiteside Dep. 55. Typically during the hiring process, Whiteside would not personally advertise or seek out applicants, instead he usually allowed the Personnel Director to perform that function. Whiteside Dep. 39-40, 49-50. After applications were received by Whiteside, he would then perform an interview with the applicants he found suitable for the position, and he would hire whoever he deemed fit for the position. Whiteside Dep. 55.

[2] Such personal references were not uncommon to the County's hiring process. Underwood Dep. 69 (Ex. 3 to Pl. Response; Ex. 6 to Def. Motion).

discuss the position. Pl. Dep. 34.

During Plaintiff's interview with Whiteside and Boatwright, Plaintiff expressed her primary reason for seeking employment with the County was her need for healthcare benefits. Pl. Dep. 44, 163; Whiteside Dep. 107; Boatwright Dep. 64-65. Whiteside then assured Plaintiff that although he was only hiring as her part-time, her status would soon change to be a full-time employee; at that time, she would receive the benefits she sought. Pl. Dep. 44, 164; Whiteside Dep. 107; Boatwright Dep. 64-65. In fact, Boatwright testified that Underwood assured her that all requisite approvals had been sought and obtained from appropriate channels for Plaintiff to receive full time status once the Department moved to the new location. Boatwright Dep. 101. Whiteside told Plaintiff that her pay rate would begin at $9.50 per hour and when the Department moved to the new location and she became a full-time employee, her pay rate would increase to $10.00. Pl. Dep. 54-55, 164; Whiteside Dep. 79-82; Boatwright Dep. 63-64. Relying upon these assurances, Plaintiff accepted the position and immediately went to the personnel and benefits department to complete the appropriate paperwork. Pl. Dep. 55-56.

The day after the meeting, Whiteside received a phone call from Underwood, who questioned why he would hire someone who had previously sued the County and informed him that he could not hire Plaintiff because of her involvement with the animal shelter lawsuit. Whiteside Dep. 62-63. Whiteside answered that he was not aware of such a lawsuit, and that he hired Plaintiff to work in the Department part-time. Whiteside Dep. 63. Underwood told Whiteside that he was "in trouble" and that she was going to talk to Stanley Pasley, the County Supervisor. Whiteside Dep. 63-65. Shortly thereafter, Pasley called Whiteside into his office. Whiteside Dep. 63-65. Pasley similarly questioned Whiteside, and he expressed his displeasure that Whiteside hired Plaintiff because she is the wife of the Mayor of Kingstree. Whiteside Dep. 64, 73-74. Pasley mentioned that

Williamsburg County and the Town of Kingstree were "kind of in competition" with respect to their water systems. Whiteside Dep. 65. Whiteside asked Pasley if he should tell Plaintiff there was a mistake and they could not employ her, but Pasley told him no. Whiteside Dep. 65.

Boatwright testified that she was intensely questioned by Underwood as to "whose idea it was to hire Plaintiff" because Plaintiff previously sued the County and because she was the wife of the Mayor of Kingstree.[3]

Upon her hire, the County provided Plaintiff with the Williamsburg County Policy and Procedure Manual (the policy manual). The policy manual defines a temporary employee as "an individual who is employed in a position which is budgeted for a temporary period and who is not entitled to any County benefits or grievance procedure." Williamsburg County Policy and Procedure Manual p. 6 (Ex. 15 to Pl. Response; Ex. 2 to Def. Motion). The policy manual included a disclaimer explaining no promises or oral assurances were binding on the County unless they were in writing, signed by the County Supervisor, and labeled as a contract. Williamsburg County Policy and Procedure Manual Disclaimer (Ex. 3 to Def. Motion). Plaintiff signed the Disclaimer on February 1, 2012, acknowledging receipt of the policy manual and her understanding of the Disclaimer. Williamsburg County Policy and Procedure Manual Disclaimer.

Plaintiff began working in the Department around February 6, 2012. Pl. Dep. 29. Within her first week, Plaintiff received an Employment Status Form that had been completed by Whiteside to reflect her hire date, her status as a part-time clerk, and her pay rate of $9.50, which was ultimately submitted to Underwood for processing. Pl. Dep. 77-79; Whiteside Dep. 59-60; February 6, 2012, Employment Status Form (Ex. 6 to Pl. Response; Ex. 4 to Def. Motion). As the County Controller,

---

[3]The undersigned is unable to locate this testimony in the record, but Defendants do not object to its accuracy.

Underwood was responsible for supervising personnel and finance for the County. Whiteside Dep. 40; Underwood Dep. 27-28. Prior to approving an Employment Status Form submitted for a new hire, the Controller must verify the County had a position available in the department, the position has been approved by County Council, and that the proposed salary was within what the budget allowed. Underwood Dep. 69-70. The County had not approved nor budgeted for a position in the Department other than a temporary position earning $8.50 per hour. Underwood Dep. 73, 75. Therefore, Underwood altered the document by reducing Plaintiff's pay rate to $8.50 and changing her status from part-time clerk to temporary employee. February 6, 2012, Employment Status Form.

Whiteside instructed Plaintiff not to sign the document until he had an opportunity to clarify with Underwood his intentions to have Plaintiff classified as a part-time clerk and to pay her at an hourly rate of $9.50.[4] Pl. Dep. 78. Whiteside attempted on several occasions to have Plaintiff's employment status changed to conform to the agreement he had made with her upon hiring Plaintiff to no avail. Whiteside Dep. 68-69; Whiteside Letter, dated September 5, 2012 (Ex. 7 to Pl. Response). Boatwright also unsuccessfully attempted to have Underwood raise Plaintiff's pay rate or her employment status to at least part-time in accord with Plaintiff's discussions with Whiteside. Boatwright Dep. 66-67. For five or six weeks, Whiteside paid Plaintiff out of his own salary for the difference between the pay rate he promised her and the reduced pay rate provided by Underwood. Whiteside Dep.71, 105; Pl. Dep. 43.

Despite Whiteside's and Boatwright's attempts to have Plaintiff's employment status changed, another employment status form was created by Whiteside and changed by Haile to reflect

---

[4] Plaintiff admits that she knew Whiteside did not have authority to offer a full-time position or benefits without approval by the County. Pl. Dep. 87-88, 89, 90, 93. In addition, Whiteside concedes he lacked authority to provide Plaintiff with a certain rate of pay and full-time benefits without County approval. Whiteside Dep. 71, 77, 83, 85.

that Plaintiff was to remain as a temporary clerk. May 15, 2012, Employment Status Form (Ex. 8 to Pl. Response; Ex. 7 to Def. Motion); Haile Dep. 5 (Ex. 8 to Def. Motion). This form included a handwritten note stating "per Phyllis, this is a FT-Temp position until approved by Finance Committee at 9.50 hourly." May 15, 2012, Employment Status Form. Whiteside also included on this form a handwritten note, indicating that the form was his fourth attempt to secure the rate of pay promised by him to Plaintiff and to clarify that the Department had since moved to the new location, and the county approved her position. May 15, 2012, Employment Status Form. Plaintiff declined to sign this form as well.

On June 11, 2012, another Employment Status Form was created, indicating Plaintiff's rate of pay was increased to ten dollars per hour, which Plaintiff signed. June 11, 2012, Employment Status Form (Ex. 9 to Pl. Response; Ex. 9 to Def. Motion). The form still identified Plaintiff's position as temporary clerk. June 11, 2012, Employment Status Form. At the time Plaintiff signed this form, she was working up to forty hours per week, but was still denied healthcare benefits. Pl. Dep. 93, 155, 169.

Underwood left the county's employment in mid-2012 and was replaced by Clifford Ackerman in a newly-created position entitled Director of Finance and Administration, which encompassed the duties and responsibilities of the former Controller position. Ackerman Dep. 31-32 (Ex. 10 to Pl. Response; Ex. 10 to Def. Motion). In August of 2012, Plaintiff wrote a letter to Whiteside requesting more information about her employment status and why she had been denied benefits. Pl. Letter dated August 21, 2012 (Ex. 11 to Pl. Response). Whiteside responded by noting that he had repeatedly been overruled in attempting to obtain benefits for her. Whiteside Letter dated Sept. 5, 2012 (Ex. 12 to Pl. Response). Ackerman also responded to Plaintiff's letter in a memo to her, stating that "[t]he reason that you are not receiving benefits is that your status is not that of a

-6-

-7-

regular full time employee of the county, but is still temporary full time, and thus you are not entitled to benefits at this time." Ackerman Memo dated September 10, 2012 (Ex. 13 to Pl. Response; Ex. 11 to Def. Motion). Plaintiff challenged Ackerman's response by asserting that she should be classified as a regular full time employee for two reasons: (1) she received holiday pay, which the policy manual dictates is provided only to regular full-time employees; and (2) the policy manual states that new employees who receive a satisfactory six month performance evaluation–which Plaintiff received–will be granted full time status.[5] Pl. Memo dated September 14, 2012 (Ex. 14 to Pl. Response). Ackerman explained that Plaintiff had received holiday pay in error and that the portion of the policy manual Plaintiff referenced with respect to the performance evaluation applied only to regular employees. Ackerman Memo dated October 4, 2014 (Ex. 17 to Pl. Response; Ex. 12 to Def. Motion). To date, Plaintiff remains a temporary employee.

Plaintiff points to two African-American county employees hired after her that she claims were treated differently from her. Yvette Cooper was originally hired to the tax collector's office and was employed as part-time. Cooper Dep. 4 (Ex. 17 to Pl. Response). She later applied for and obtained a full-time position within the Probate Court, in which every employee is African-American. Cooper Dep. 8-9. Mary Scott worked in the treasurer's department and was employed as full-time. Pl. Dep. 36, 66, 99. Boatwright testified that she and Sherrie Footman, a black employee within the water and sewer department, agreed that Plaintiff would not be treated differently if she was black. Boatwright Dep. 88-89.

---

[5] The policy manual actually states that a probationary employee with a satisfactory rating after a six month period will be granted regular status "unless the employee is a temporary employee. Williamsburg County Policy and Procedure Manual pp. 6, 15.

### III.    STANDARD OF REVIEW

The moving party bears the burden of showing that summary judgment is proper. Summary judgment is proper if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof. Celotex, 477 U.S. at 322. Once the moving party has brought into question whether there is a genuine dispute for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine dispute for trial. Fed.R.Civ.P. 56(e); Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986). The non-moving party must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Barber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

To show that a genuine dispute of material fact exists, a party may not rest upon the mere allegations or denials of his pleadings. See Celotex, 477 U.S. at 324. Rather, the party must present evidence supporting his or her position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory

answers, or other materials." Fed.R.Civ.P. 56(c)(1)(A); see also <u>Cray Communications, Inc. v. Novatel Computer Systems, Inc.</u>, 33 F.3d 390 (4th Cir. 1994); <u>Orsi v. Kickwood</u>, 999 F.2d 86 (4th Cir. 1993); Local Rules 7.04, 7.05, D.S.C.

## IV.    DISCUSSION

### A.    Race Discrimination

Title VII makes it "an unlawful employment practice for an employer-(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin...." 42 U.S.C. § 2000e–2(a)(1).

A plaintiff asserting a claim of unlawful employment discrimination may proceed through two avenues of proof.  First, she may establish through direct or circumstantial proof that a protected characteristic such as race was a motivating factor in the employer's adverse decision. See <u>Diamond v. Colonial Life & Acc. Ins. Co.</u>, 416 F.3d 310, 318 (4th Cir.2005); <u>Hill v. Lockheed Martin Logistics Mgmt., Inc.</u>, 354 F.3d 277, 284–85 (4th Cir.2004) (en banc). Direct evidence is defined as "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." <u>Warch v. Ohio Cas. Ins. Co.</u>, 435 F.3d 510, 520 (4th Cir.2006) (internal quotations omitted). Direct evidence is said to prove a fact "without any inference or presumptions." <u>O'Connor v. Consol. Coin Caterers Corp.</u>, 56 F.3d 542, 548 (4th Cir.1995).  Circumstantial evidence must be of sufficient probative force to raise a genuine dispute of material fact.  <u>Evans v. Technologies Applications & Service Co.</u>, 80 F.3d 954, 959 (4th Cir. 1996).

Plaintiff argues that she can establish her claim of race discrimination by showing a "convincing 'mosaic' of circumstantial evidence such that a reasonable jury could infer

-9-

discriminatory intent." Pl. Response p. 17. Under this approach,

> [n]o single piece of evidence might amount to a smoking gun…but the convincing mosaic approach allows a plaintiff to establish Retaliation 'by assembling a number of pieces of evidence non meaningful in itself, consistent with the proposition of statistical theory that a number of observations each of which supports a proposition only weakly can, when taken as a whole, provide strong support if all point in the same direction….

Hobgood v. v. Ill. Gaming Bd., 731 F.3d 635, 647 (7th Cir. 2013); see also Cason v. S.C. State Ports Auth., 2:11–CV–2241–RMG, 2014 WL 588065, *4 (D.S.C. Feb. 14, 2014) (citing Hobgood). Defendants note that the mosaic of circumstantial evidence theory has not been adopted by the Fourth Circuit, pointing to Giraldo v. City of Columbia, No. 3:12-cv-3357-JFA, 2014 WL 4700645 (D.S.C. Sept. 18, 2014), in which this court stated,

> [A]fter research, this Court can only find one case within the Fourth Circuit that cited and applied the mosaic theory, and it is the District of South Carolina case cited by Plaintiff. Nevertheless, this Court is not persuaded by the mosaic theory, or that application of the mosaic theory is binding. Further, Plaintiff has cited to no precedent establishing that the Fourth Circuit Court of Appeals has adopted the mosaic theory.

Id. at *2; see also Harrison v. S.C. Dep't of Mental Health, No. 3:12-cv-1754-JFA, 2014 WL 4700642, * 3 (D.S.C. Sept. 18, 2014). Perhaps stated differently, the law in this circuit provides that when evaluating whether the plaintiff has proffered sufficient circumstantial evidence to sustain her claims in the face of a summary judgment motion, the court should consider whether, as a whole, the plaintiff has "presented probative circumstantial evidence to show that [the employer] acted with discriminatory animus." Warch, 435 F.3d at 521; see also Hill, 354 F.3d at 286; Evans, 80 F.3d at 959. The court should consider the evidence as a whole rather than in isolation. See, e.g., Cook v. CSX Trans. Corp., 988 F.2d 507, 512 (4th Cir.1993) ("To focus on one piece of the record without

considering the whole would distort the permissible inferences to be drawn.").[6]

Plaintiff argues that she fulfilled her employment obligations for the first six months of her time with the County and received a satisfactory evaluation from her supervisor, but was not placed on a regular, full-time status like at least two African-American employees who performed similar clerical duties as Plaintiff. However, the evidence in the record reveals that the county's policy of moving an employee to regular status after six months of employment and a satisfactory performance evaluation refers to moving probationary employees to regular employees, not temporary employees to regular employees. In fact, the policy's definition of probationary employee specifically states "[e]mployees who receive a satisfactory evaluation after six (6) months of employment receive regular status <u>unless the employee is a temporary employee</u>." Williamsburg County Policy and Procedure Manual p. 6 (emphasis added). There is no evidence in the record that one of the African-American employees to whom Plaintiff refers, Mary Scott, was ever classified as temporary employee, as Plaintiff was classified. Yvette Cooper first worked with the county in the tax assessor's office, and later applied for and obtained another position with the Probate Judge.[7] Furthermore, both Cooper and Scott were employed by elected officials other than the County Supervisor. Scott was hired by and works for the County Treasurer, and Cooper was hired by and works for the County Probate Judge. Scott Decl. ¶¶ 1-4; Cooper Dep. 6-7. The County Supervisor,

---

[6]The court notes that in both <u>Hobgood</u> and <u>Cason</u> the "convincing mosaic of circumstantial evidence" approach is used with respect to the but-for analysis necessary in retaliation cases. <u>Hobgood</u>, 731 F.3d at 643-44; <u>Cason</u>, 2014 WL 588065, *4.

[7]In his deposition, Ackerman describes Cooper's first position with the tax assessor's office as temporary. Ackerman Dep. 72. Cooper described the position as part time rather than temporary. Nevertheless, Cooper subsequently obtained a full time position with benefits by applying for a new position with the Probate Judge, not by completing six months of employment and obtaining a satisfactory evaluation as Plaintiff suggests. Cooper Dep. 6-7.

under whom Plaintiff works, has no authority over employees of the Treasurer or the Probate Judge. S.C. Code Ann. § 4-9-430 ("With the exception of organizational policies established by the governing body, the county supervisor shall exercise no authority over any elected officials of the county whose offices were created either by the Constitution or by general law of the State.").

Plaintiff also points to the deposition testimony of Vicki Boatwright, in which she stated that she and Sherrie Footman, a black employee within the water and sewer department, agreed that Plaintiff would not be treated differently if she was black. Boatwright Dep. 88-89. However, Boatwright's testimony of comments made by Footman is inadmissible hearsay and cannot be used in opposition to summary judgment. See Greensboro Prof'l Fire Fighters Ass'n v. City of Greensboro, 64 F.3d 962, 967 (4th Cir.1995) ("[E]vidence [that] consists of inadmissible hearsay ... is neither admissible at trial nor supportive of an opposition to a motion for summary judgment."); Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993) (holding that the evidence relied upon during the summary judgment stage of litigation must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits"); Rule 802, Fed.R.Evid.[8] Further, while Boatwright perceived that Plaintiff was treated differently because of her race, she fails to identify the observations that led to this perception.

Finally, Plaintiff argues that Whiteside cleared his budget to hire Plaintiff[9], and had to take over the hiring process because no one would assist him. Whiteside disputes the representation that

---

[8] Plaintiff fails to point to any applicable hearsay exception. See Rule 803, Fed.R.Evid.

[9] Plaintiff does not provide a specific citation to Whiteside's deposition for this statement, and the undersigned has been unable to locate testimony reflecting this representation within the portions of Whiteside's deposition provided to the court. Nevertheless, even assuming this is true, it is insufficient to create an issue of fact as to whether race played a role in Plaintiff's classification as a temporary employee.

he did not have the authority to hire Plaintiff at a certain classification or salary. However, the evidence in the record reveals that the employee status form, which includes the position an employee holds and the rate of pay, includes a signature line requiring approval by the Controller. See Employee Status Forms. Underwood, the Controller at the time Plaintiff's employee status forms were completed, testified that she did three things before approving the employment action: verified that the department had an open position, that it had been approved, and that they rate of pay was within the budget. Regardless of whether Whiteside had "cleared his budget" to hire Plaintiff, County Council had not approved any position other than a temporary position at $8.50 per hour. Further, the failure of the personnel department to assist Whiteside in the hiring process occurred before Plaintiff ever expressed interest in the position.

This evidence fails to amount to circumstantial evidence sufficient to create an inference under the direct method of proof that Plaintiff has been treated differently because of her race.

When direct evidence is lacking, a plaintiff may proceed under the burden-shifting proof scheme established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this burden-shifting scheme, Plaintiff has the initial burden of establishing a prima facie case of discrimination. Id. To establish a prima facie case of race discrimination, the plaintiff must present facts showing that (1) she is a member of a protected class; (2) she suffered adverse employment action; (3) she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action; and (4) similarly-situated employees outside the protected class received more favorable treatment. White v. BFI Waste Services, LLC, 375 F.3d 288, 295 (4th Cir.2004). The fourth element can also be met by showing other circumstances giving rise to a reasonable inference of unlawful discrimination. Miles v. Dell, Inc., 429 F.3d 480, 486–87 (4th Cir.2005).

If Plaintiff establishes a prima facie case, the burden shifts to Defendants to produce a legitimate, nondiscriminatory reason for the disparate treatment. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). This is merely a burden of production, not of persuasion. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

Once Defendants have met their burden of production by producing a legitimate, nondiscriminatory reason, the sole remaining issue is "discrimination vel non." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (citing Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 716, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983)). In other words, the burden shifts back to Plaintiff to demonstrate by a preponderance of the evidence that the legitimate reason produced by Defendants is not its true reason, but was pretext for discrimination. Reeves, 530 U.S. at 143. Throughout the burden shifting scheme set forth in McDonnell Douglas, the ultimate burden of proving that Defendants intentionally discriminated against Plaintiff remains at all times with Plaintiff. Plaintiff has the ultimate burden of presenting evidence from which a reasonable jury could conclude Defendants intentionally discriminated against her.

With respect to the prima facie case, the parties do not dispute that Plaintiff falls within a protected class.  However, Defendants argue that Plaintiff has not suffered an adverse employment action because she has always held the same position in which she was hired–a temporary employee. With regard to a disparate treatment claim, an adverse employment action is an act that "adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment." James v. Booz–Allen & Hamilton, Inc., 368 F.3d 371, 375 (4th Cir.2004). It must constitute a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly

-14-

different job responsibilities, or a decision causing a significant change in benefits. Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). Although Plaintiff did not receive the benefits that Whiteside told her she would receive, no decision was ever made causing a "significant change in benefits" since the record reveals that County Council never approved a position for Plaintiff that would provide her with benefits. While it does not appear that this would qualify as an adverse employment action, it is not necessary to reach this issue because Plaintiff fails to show that similarly situated employees outside her protected class received more favorable treatment.

As discussed above, Plaintiff points to two black employees, Yvette Cooper and Mary Scott, as similarly situated employees who received more favorable treatment. To be similarly situated, a "plaintiff must establish that 'other employees' were similarly situated in all relevant respects; that they 'dealt with the same supervisor, [were] subject to the same standards and ... engaged in the same conduct without such mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" See Ward v. City of North Myrtle Beach, 457 F.Supp.2d 625, 643 (D.S.C.2006). Although Plaintiff need not establish exact similarity, see Cook v. CSX Transp. Corp., 988 F.2d 507, 511 (4th Cir.1993), "[t]he similarity between comparators and the seriousness of their respective offenses must be clearly established in order to be meaningful." Lightner v. City of Wilmington, 545 F.3d 260, 265 (4th Cir.2008). Neither Scott nor Cooper were similarly situated to Plaintiff. They were both employed by elected officials other than the County Supervisor. Scott was hired by and works for the County Treasurer, and Cooper was hired by and works for the County Probate Judge. By law, the County Supervisor, under whom Plaintiff works, has no authority over employees of the Treasurer or the Probate Judge. S.C. Code Ann. § 4-9-430 ("With the exception of organizational policies established by the governing body, the county supervisor shall exercise

no authority over any elected officials of the county whose offices were created either by the Constitution or by general law of the State."). Plaintiff points to no other employees outside her protected class who worked in the same department and were supervised by the same supervisor.[10] Thus, she fails to present sufficient evidence to create an issue of fact as to whether similarly situated employees outside her protected class were treated more favorably or other evidence giving rise to a reasonable inference of discrimination. As such, Plaintiff is unable to preclude summary judgment on her race discrimination claim under the McDonnell-Douglas framework as well.

In sum, the Fourth Circuit has emphasized that, "[r]egardless of the type of evidence offered by a plaintiff as support for her discrimination claim (direct, circumstantial, or evidence of pretext), or whether she proceeds under a mixed-motive or single-motive theory, '[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination.'" Hill, 354 F.3d at 286 (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 153, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)). Because Plaintiff fails to present sufficient evidence under any theory or method of proof, summary judgment is appropriate on her race discrimination claim under Title VII.

### B. Retaliation

Plaintiff also asserts a claim of retaliation under Title VII. She does not proceed under the direct method of proof. Title VII makes it an "unlawful employment practice for an employer to

---

[10] Although Plaintiff mentions no other employees in her response under the section of facts entitled "Reverse Race Discrimination," she does mention three former employees in the water and sewer department–Lydia Brown, Gracie Hannah, and Shirley Reardon–who were hired into part-time positions rather than temporary positions, under the section of facts entitled "Civil Conspiracy." Pl. Response pp. 9-10; Brown Employment Status Form, Hannah Employment Status Form, Reardon Employee Status Form (Exs. 18-20 to Pl. Response). However, she does not identify the race of these individuals and does not argue that they were similarly situated employees outside her protected class.

discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).  To establish a prima facie case of retaliation under Title VII, a plaintiff must show (1) she engaged in protected activity, (2) the employer took adverse employment action against her, and (3) a causal connection existed between the protected activity and the adverse action. Ross v. Communications Satellite Corp., 759 F.2d 355, 365 (4th Cir.1985); Laughlin v. Metropolitan Washington Airports Authority, 149 F.3d 253, 258 (4th Cir.1998); Causey v. Balog, 162 F.3d 795, 803 (4th Cir.1998). If Plaintiff establishes a prima facie case, Defendants can rebut the presumption of retaliation by articulating a non-retaliatory reason for its actions. At that point, Plaintiff must present evidence sufficient to create a genuine issue of material fact that Defendants' legitimate, non-retaliatory reason is pretextual. See Matvia v. Bald Head Island Management, 259 F.3d 261, 271 (4th Cir.2001).

  Plaintiff's retaliation claim fails as well because she cannot show that she engaged in protected activity.  To establish "protected activity," Plaintiff must show she opposed an employment practice made unlawful by Title VII which she reasonably believed had occurred or was occurring. Bigge v. Albertsons, Inc., 894 F.2d 1497, 1503 (11th Cir.1990); see also Ross, 759 F.2d at 355 n. 1 (stating that a Title VII oppositional retaliation claimant need not show that the underlying claim of sexual harassment was in fact meritorious in order to prevail). "[T]he 'opposition clause,' by its very terms, requires that the employee at least have actually opposed employment practices made unlawful by Title VII. That is to say, the clause protects opposition neither to all unlawful employment practices nor to practices the employee simply thinks are somehow unfair." McNair v. Computer Data Sys., Inc., 172 F.3d 863, 1999 WL 30959, at *5 (4th Cir. Jan.26, 1999)

(unpublished). With respect to protected activity, Plaintiff argues only that she

> made complaints to Whiteside, Boatwright, and Ackerman about being treated differently as it related to her employment classification. Specifically, even Whiteside reported the same through his chain of command on behalf of Plaintiff. Directly after making these complaints, Plaintiff continued to remain on a less desirable employment status; her rate of pay was denied for an extended period of time; she failed to receive health insurance; and she failed to receive paid holidays and leave accrual time like other employees who worked the same number of hours as Plaintiff and received satisfactory evaluations like Plaintiff.

Pl. Response pp. 23-24. Plaintiff makes no mention in her response of complaining of being treated differently because of her race, nor does she point to any evidence in the record of the same. In her Charge of Discrimination and during her deposition Plaintiff stated that the County retaliated against her because (1) she is married to the Mayor of Kingstree, a political opponent of the County Supervisor; and (2) she served on the board of the local animal shelter in May 2011 when the board filed a lawsuit against the County about funding for the shelter. (Pl. Dep. 101–108, 137, 114; Charge of Discrimination (Ex. 14 to Def. Motion). Neither of the practices identified by Plaintiff are unlawful under Title VII. See Balazs v. Liebenthal, 32 F.3d 151, 159 (4th Cir. 1994)(quoting Holder v. City of Raleigh, 867 F.2d 823, 828 (4th Cir. 1989) ("The list of impermissible considerations within the context of employment practice is both limited and specific: 'race, color, religion, sex or national origin.' We are not free to add our own considerations to the list.").

Plaintiff complained of being treated unfairly but not because she was white. Title VII is not a catch-all provision for general employment grievances. See Lightner v. City of Wilmington, N.C., 545 F.3d 260, 264 (4th Cir. 2008). Thus, summary judgment is appropriate on her retaliation claim as well.

**C.     State Law Claims**

In addition to her federal causes of action under Title VII, Plaintiff also asserts state law

claims for breach of contract against the County and civil conspiracy against the individual defendants. Plaintiff argues that, if the court grants summary judgment on her Title VII claims, it should remand her state law claims to the Williamsburg County Court of Common Pleas. Defendants argue that the court should use its discretion to exercise supplemental jurisdiction over the state law claims.

Title 28 U.S.C. § 1367(c)(3) provides, in pertinent part, "[t]he district courts may decline to exercise supplemental jurisdiction over a claim ... if ... the district court has dismissed all claims over which it has original jurisdiction...." The Fourth Circuit has recognized that "trial courts enjoy wide latitude in determining whether or not to retain jurisdiction over state claims when all federal claims have been extinguished." Shanaghan v. Cahill, 58 F.3d 106, 110 (4th Cir.1995) (holding district court did not abuse its discretion in declining to retain jurisdiction over the state law claims). See also, e.g., United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726–27, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); Revene v. Charles County Comm'rs, 882 F.2d 870, 875 (4th Cir.1989). In determining whether to retain jurisdiction, courts consider "the convenience and fairness to the parties, existence of any underlying issues of federal policy, comity, and considerations of judicial economy." Shanaghan, 58 F.3d at 110. Here, the undersigned recommends that the district judge decline to retain supplemental jurisdiction over Plaintiff's state law claims for breach of contract and civil conspiracy. The convenience and fairness to the parties would not be disturbed since the case originated in state court and, thus, Plaintiff would not have to file a new action. In addition, there are no issues of federal policy underlying the remaining state law claims. Finally, comity favors remand since the remaining claims are quintessential state law questions. In United Mine Workers of America v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), the Supreme Court cautioned that "[n]eedless decisions of state law should be avoided both as a matter of comity and

to promote justice between the parties, by procuring for them a superfooted reading of applicable law. . . . if the federal law claims are dismissed before trial ... the state claims should be dismissed as well." Accordingly, should the district judge accept the recommendation with respect to Plaintiff's federal claims, it is recommended that the court decline to exercise jurisdiction over the remaining state law claims. See, e.g., Finnin v. Board of County Commissioners of Frederick County, Md., 498 F.Supp.2d 772, 784-85 (D.Md. 2007) (exercising discretion to decline to address state law claims where the issues involved the day-to-day operations of and the pay and promotional policies of the Frederick County government).

## V.     CONCLUSION

For the reasons discussed above, it is recommended that Defendants' Motion for Summary Judgment (Document # 32) be granted as to Plaintiff's race discrimination and retaliation claims under Title VII, and that the remaining state law claims be remanded to the Court of Common Pleas, Williamsburg County, South Carolina.

 s/Thomas E. Rogers, III
Thomas E. Rogers, III
United States Magistrate Judge

May 21, 2015
Florence, South Carolina